**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADHIKAAR, | ) |
| | ) |
| and | ) |
| | ) |
| THE NEW YORK IMMIGRATION | ) |
| COALITION, | ) |
| | ) |
| Plaintiffs, | ) **Case No. 19-cv-5881** |
| | ) |
| v. | ) |
| | ) **ECF Case** |
| UNITED STATES DEPARTMENT OF | ) **COMPLAINT FOR** |
| HOMELAND SECURITY, | ) **DECLARATORY AND** |
| | ) **INJUNCTIVE RELIEF** |
| UNITED STATES CITIZENSHIP AND | ) |
| IMMIGRATION SERVICES, | ) |
| | ) |
| UNITED STATES DEPARTMENT OF STATE, | ) **Freedom of Information Act,** |
| and | ) **5 U.S.C. § 552** |
| | ) |
| UNITED STATES IMMIGRATION AND | ) |
| CUSTOMS ENFORCEMENT, | ) |
| | ) |
| Defendants | ) |
| | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1. This is an action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, seeking agency records of the determination to terminate Temporary Protected Status (TPS) for Nepali nationals. Timely disclosure of these records is critically important because of the intended termination of legal immigration status for thousands of Nepali nationals living in the United States. The documents sought through this request will shed light on the legality of the termination, the reasons for the termination, the adequacy of the review of relevant conditions and the need for immediate action to reverse or otherwise ameliorate that decision.

2. TPS is a status under the Immigration and Nationality Act (INA) that provides access to employment authorization and protection from deportation. TPS requires two steps: first, the country must be designated as warranting TPS due to specific statutory conditions; second, nationals of that country must apply for TPS and demonstrate eligibility, including a demonstration that they do not have disqualifying criminal convictions. Once a country is designated for TPS, the Secretary of Homeland Security does not have the discretion to terminate that status. Instead, the statute requires a factual inquiry, including consultation with other government agencies, into the conditions that warranted TPS and requires that TPS be continued unless the factual record warrants termination.

3. The Secretary of Homeland Security designated Nepal for TPS in 2015 after a 7.8 magnitude earthquake and a number of significant aftershocks struck the country, killing nearly 9,000 people, injuring more than 20,000 people, displacing millions, and destroying or significantly damaging over 750,000 homes. On October 26, 2016, DHS extended Nepal's designation for eighteen months.  The extension took into account a variety of factors and conditions that arose subsequent to the original designation, many of which were wholly or partially unrelated to the earthquakes, including civil unrest, the obstruction of crossings at the Nepal-India border, and inadequate sanitation.  In August 2017, the worst rains in 15 years struck Nepal, triggering widespread large-scale flooding and landslides, causing significant property damage, and impacting access to food, water, and healthcare.

4. On April 26, 2018, the Secretary of Homeland Security announced the termination of TPS for Nepal effective June 24, 2019.  *See* 83 FR 23705 (May 22, 2018).  In terminating Nepal's TPS, DHS appeared to consider only whether Nepal had recovered from the earthquake that triggered its original designation.  Intervening conditions that affected the country were not

considered except to the extent they related directly to the original basis for designation.  The announcement terminating Nepal's TPS was published in the Federal Register on May 22, 2018. The Federal Register Notice made no mention of intervening events and did not discuss the severe flooding of August 2017.

5. As a result of the decision to terminate TPS, approximately 15,000 Nepali nationals who live in the United States face loss of their right to remain in the United States and to obtain employment authorization. Many of these TPS recipients are also parents to U.S.-citizen children, who face total disruption of their lives if their parents lose their ability to remain in the United States.

6. Plaintiffs, the New York Immigration Coalition and Adhikaar (collectively, "Plaintiffs") bring this action to obtain undisclosed government records regarding the facts and standard applied by the Defendant agencies in the termination of TPS for nationals of Nepal.

7. Plaintiffs submitted FOIA requests seeking records relating to the non-discretionary determination to terminate TPS for nationals of Nepal. These requests were addressed to Defendants Department of State (DOS), Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS). Plaintiffs are entitled to the timely release of records responsive to the requests.

8. The records Plaintiffs seek would contribute to a much greater understanding of the relevant conditions undergirding the termination of TPS for Nepal. Specifically, the records will reveal the extent to which Defendants cabined their evaluation of conditions to those immediately caused by the April 2015 earthquake that struck Nepal, or whether subsequent conditions that impeded earthquake recovery including civil unrest, the obstruction of crossings at the Nepal-India border, inadequate sanitation and widespread flooding were  part  of  Defendants'

determination.  Moreover, the records will help clarify the extent to which the determination to terminate TPS involved a changed legal standard and/or policy considerations and the improper consideration of factors unrelated to extraordinary and temporary conditions in Nepal that prevent Nepali nationals from returning to Nepal in safety.

9. To date, Defendants have produced no records in response to Plaintiffs' FOIA requests. Defendants' failure to respond to Plaintiffs' requests violates FOIA. Plaintiffs seek an order requiring Defendants to produce, and enjoining Defendants from withholding, records responsive to the requests.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B) because the Plaintiffs have their principal place of business within this District. Venue is proper under 5 U.S.C. § 552(a)(4)(B).

## PARTIES

11.      Plaintiff Adhikaar is a non-profit organization committed to improving the lives of the Nepali-speaking community and uplifting their voices in the social justice movement. Adhikaar's principal place of business is located at 71-07 Woodside Ave, Flushing, NY 11377. Adhikaar has assisted thousands of Nepali individuals and families through direct service, hands-on trainings and conferences, community organizing and base-building, advocacy and leadership development directed at improving the lives of Nepali-speaking communities across the country.

12.      Plaintiff The New York Immigration Coalition ("NYIC") is an umbrella policy & advocacy organization that represents over 200 immigrant and refugee rights groups throughout New York.  Its principal place of business is at 131 W 33rd Street, Ste 610, New York, NY 10001. The NYIC serves one of the largest and most diverse newcomer populations in the United States.

The multi-racial and multi-sector NYIC membership base includes grassroots and nonprofit community organizations, religious and academic institutions, labor unions, as well as legal and socioeconomic justice organizations. Since its founding in 1987, the NYIC has spearheaded innovative policies, promoting and protecting the rights of immigrant communities, improving newcomer access to services, developing leadership and capacity, expanding civic participation, and mobilizing member groups to respond to the fluctuating needs of immigrant communities.

13.     Defendant Department of Homeland Security (DHS) is a department within the executive branch of the United States government. It is an "agency" within the meaning of 5 U.S.C. § 552(f)(1). DHS is headquartered in Washington, DC, and has field offices in New York, NY. Upon information and belief, DHS has possession, custody, and control over the records Plaintiffs seek.

14.     Defendant Department of State (DOS) is a department within the executive branch of the United States government. It is an "agency" within the meaning of 5 U.S.C. § 552(f)(1) and is headquartered in Washington, DC. Upon information and belief, DOS has possession, custody, and control over the records Plaintiffs seek.

15.     Defendant Immigration and Customs Enforcement (ICE) is a component agency of DHS. It also is an "agency" within the meaning of 5 U.S.C. § 552(f)(1). ICE is headquartered in Washington, DC, and has field offices in New York, NY. Upon information and belief, ICE has possession, custody, and control over the records Plaintiffs seek.

16.     Defendant United States Citizenship and Immigration Services (USCIS) is a component agency of DHS. It also is an "agency" within the meaning of 5 U.S.C. § 552(f)(1). USCIS is headquartered in Washington, DC, and has field offices in New York, NY. Upon information and belief, USCIS has possession, custody, and control over the records Plaintiffs

seek.

## STATEMENT OF FACTS
### Background of TPS Designation and Termination for Nepal

17.      Under 8 U.S.C. § 1254a(b)(1), the Secretary of Homeland Security (Secretary) is authorized to designate a foreign state for TPS upon a finding that such state is experiencing ongoing armed conflict, an environmental disaster, or "extraordinary and temporary conditions."

18.      During the period for which the Secretary has designated a country for TPS, TPS beneficiaries are eligible to remain in the United States and may obtain work authorization. 8 U.S.C. § 1254a(a)(1).

19.      At least sixty days before the end of the period of the TPS designation, the Secretary, in consultation with the other agencies, must review the conditions in the foreign state. 8 U.S.C. § 1254a (b)(3)(A). Unless the Secretary determines that a foreign state no longer meets the conditions for which a designation is in effect, the period of designation is automatically extended for an additional period of at least six months. 8 U.S.C. § 1254a(b)(3)(C).

20.      The Secretary of Homeland Security designated Nepal for TPS in June 2015 after a 7.8 magnitude earthquake and a number of significant aftershocks struck the country, killing nearly 9,000 people, injuring more than 20,000 people, displacing millions, and destroying or significantly damaging over 750,000 homes. On October 26, 2016, DHS extended Nepal's designation for eighteen months.  The extension took into account a variety of factors and conditions that arose subsequent to the original designation, many of which were wholly or partially unrelated to the earthquakes, including civil unrest, the obstruction of crossings at the Nepal-India border, and inadequate sanitation.

21.      On April 26, 2018, the Secretary of Homeland Security announced the termination of TPS for Nepal effective June 24, 2019.  *See* 83 FR 23705 (May 22, 2018).  In terminating

Nepal's TPS, DHS appeared to consider only whether Nepal had recovered from the earthquake that triggered its original designation. Intervening conditions that affected the country were not considered except to the extent they related directly to the original basis for designation.

22.     During the periodic review process for Nepal, Kathy Nuebel Kovarik, the Chief of the Office of Policy and Strategy at USCIS, instructed career employees to focus the country conditions report "specifically . . . on progress in earthquake and recovery efforts" as opposed to the "extremely comprehensive" overview "usually" provided. In response, career employees agreed "not to devote research" to political crises and other intervening conditions not directly related to the earthquake.

23.     An early draft decision memo for Nepal described the decision whether to extend or terminate as a "close case." It described the destructive intervening events that had befallen Nepal but then dismissed them, because they were not "primarily" related to the original event, stating: "In August 2017, the worst rains in 15 years struck Nepal, triggering widespread large-scale flooding and landslides, causing significant property damage, and impacting access to food, water, and healthcare, albeit primarily in the southern plains region that has been little affected by the earthquake." The draft recommended termination with an eighteen-month wind down period.

24.     Upon reviewing a subsequent draft decision memo, Lee Cissna, the Director of USCIS, complained that it did not "adequately support the proposal to terminate TPS." He noted specific sections of the memo that he viewed as problematic, including factual statements about challenges to Nepal's rebuilding efforts and the number of individuals still living in temporary shelters.

25.     The final Nepal decision memo recommended termination with a twelve-month wind down period and no longer described the decision as a "close case." The memo emphasized original conditions and significantly downplayed the significance of any intervening factors. For example, it limited consideration of the damage caused by severe, post-earthquake flooding in Nepal to simply one of several "[f]actors delaying the completion of recovery and reconstruction efforts" but otherwise "unrelated to the earthquake that led to the TPS designation" and, therefore, not relevant to the termination decision. To the extent the decision memo considered the independent effects of severe flooding, it was only to assert that disruption caused by the flooding did not "rise to the level of a new event that would warrant a new TPS designation."

26.     In a Press Release announcing the termination of TPS for Nepal, DHS explained, "[t]he decision to terminate TPS for Nepal was made after a review of the environmental disaster-related conditions upon which the country's original designation was based and an assessment of whether those originating conditions continue to exist as required by statute."

27.     Accompanying DHS Press Affairs Guidance stated, "[b]ased on careful consideration of available information . . . the Secretary determined that the original conditions caused by the 2015 earthquake no longer exist. Thus, as required under the applicable statute, the current TPS designation must be terminated."

28.     The announcement terminating Nepal's TPS was published in the Federal Register on May 22, 2018. The Federal Register Notice made no mention of intervening events and did not discuss the severe flooding of August 2017.  On March 12, 2019, DHS agreed to postpone termination of Nepal's TPS pending the outcome of the appeal in *Ramos v. Nielsen*, No. 18-01554 (9th Cir.).

29.     On December 4, 2018, over 80 members of the U.S. House of Representatives sent a letter to Acting Inspector General, John V. Kelly, requesting an immediate investigation into the various regulatory irregularities and potentially unlawful decisions stemming from DHS's decision to terminate TPS for Sudan, Nicaragua, Nepal, Haiti, El Salvador, and Honduras.  On March 6, 2019, the U.S. House Committee on the Judiciary held hearings concerning these issues.

30.     As a result of the decision to terminate TPS, approximately 15,000 Nepali nationals who live in the United States face loss of their right to remain in the United States and to obtain employment authorization. Many of these TPS recipients are also parents to U.S.-citizen children, who face total disruption of their lives if their parents lose their ability to remain in the United States.

**Plaintiffs' FOIA Requests**

31.     On September 24, 2018, Plaintiffs submitted FOIA requests to USCIS (the "USCIS Requests"). (See Exhibit 1). The USCIS Requests sought the following documents:

> any and all records issued by the United States Citizenship and Immigration Services ("USCIS") and/or the Department of Homeland Security from January 1, 2018 to the present, falling into the following categories:
>
> (i)     Relating to any recommendation made by any employee of the USCIS or DHS for the extension or re-designation of Temporary Protected Status ("TPS") for nationals of Nepal since January 1, 2018.
>
> (ii)    Relating to any recommendations made by any employee of USCIS or DHS for the termination of TPS for nationals of Nepal since January 1, 2018.
>
> (iii)   Relating to correspondence and/or communications between any employee of USCIS or DHS and any employee of DOS regarding TPS for nationals of Nepal since January 1, 2018.
>
> (iv)    Relating to any recommendation made by any persons tasked with developing TPS policy or directives from the White House to any

employees of USCIS or DHS regarding the termination of TPS for nationals of Nepal since January 1, 2018.

(v)     Relating to correspondence and/or communications between any employees of USCIS or DHS and any White House personnel regarding TPS for nationals of Nepal since January 1, 2018.

(vi)     Relating to correspondence and/or communications from President Trump's Cabinet to any employee of USCIS or DHS regarding TPS for nationals of Nepal since January 1, 2018.

(vii)     Relating to correspondence and/or communications from Department of Justice (DOJ) officials to any employee of USCIS or DHS regarding TPPS for nationals of Nepal since January 1, 2018.

(viii)     Pertaining to current country conditions of Nepal, including but not limited to those complied by United States Agency for International Development (USAID) since November 1, 2017.

32.     On September 24, 2018, Plaintiffs submitted FOIA requests to the United States Department of State (the "DOS Requests"). (See Exhibit 2). The DOS Requests sought the following documents:

any and all records issued by the Department of State ("DOS") from January 1, 2018 to the present, falling into the following categories:

(i)     Relating to any recommendation made by any employee of the DOS for the extension or re-designation of Temporary Protected Status ("TPS") for nationals of Nepal since January 1, 2018.

(ii)     Relating to any recommendations made by any employee of DOS for the termination of TPS for nationals of Nepal since January 1, 2018.

(iii)     Relating to correspondence and/or communications between any employee of DOS and any employee of US Citizenship and Immigration Services ("USCIS") and/or Immigration Customs Enforcement ("ICE") regarding TPS for nationals of Nepal since January 1, 2018.

(iv)     Relating to any recommendation made by any persons tasked with developing TPS policy or directives from the White House to any

employees of DOS regarding the termination of TPS for nationals of Nepal since January 1, 2018.

(v) Relating to correspondence and/or communications between any employees of DOS and any White House personnel regarding TPS for nationals of Nepal since January 1, 2018.

(vi) Relating to correspondence and/or communications from President Trump's Cabinet to any employee of DOS regarding TPS for nationals of Nepal since January 1, 2018.

(vii) Relating to correspondence and/or communications from Department of Justice (DOJ) officials to any employee of DOS regarding TPS for nationals of Nepal since January 1, 2018.

(viii) Pertaining to current country conditions of Nepal, including but not limited to those complied by United States Agency for International Development (USAID) since November 1, 2017.

33. On September 24, 2018, Plaintiffs submitted FOIA requests to the United States Immigration and Customs Enforcement (the "ICE Requests"). (See Exhibit 3). The ICE Requests sought the following documents:

any and all records issued by Immigration and Customs Enforcement ("ICE") from January 1, 2018 to the present, falling into the following categories:

(i) Relating to any recommendation made by any employee of the ICE for the extension or re-designation of Temporary Protected Status ("TPS") for nationals of Nepal since January 1, 2018.

(ii) Relating to any recommendations made by any employee of ICE for the termination of TPS for nationals of Nepal since January 1, 2018.

(iii) Relating to correspondence and/or communications between any employee of ICE and any employee of DOS regarding TPS for nationals of Nepal since January 1, 2018.

(iv) Relating to any recommendation made by any persons tasked with developing TPS policy or directives from the White House to any employees of ICE regarding the termination of TPS for nationals of Nepal since January 1, 2018.

(v)  Relating to correspondence and/or communications between any employees of ICE and any White House personnel regarding TPS for nationals of Nepal since January 1, 2018.

(vi)  Relating to correspondence and/or communications from President Trump's Cabinet to any employee of ICE regarding TPS for nationals of Nepal since January 1, 2018.

(vii)  Relating to correspondence and/or communications from Department of Justice (DOJ) officials to any employee of ICE regarding TPS for nationals of Nepal since January 1, 2018.

(viii)  Pertaining to current country conditions of Nepal, including but not limited to those complied by United States Agency for International Development (USAID) since November 1, 2017.

34.  Plaintiffs sought a full fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii).

35.  The records Plaintiffs seek in the Requests would contribute to a much greater understanding of the relevant conditions undergirding the termination of TPS for Nepal. Specifically, the records will reveal the extent to which Defendants cabined their evaluation of conditions to those immediately caused by the April 2015 earthquake that struck Nepal, or whether subsequent conditions that impeded earthquake recovery including civil unrest, the obstruction of crossings at the Nepal-India border, inadequate sanitation and widespread flooding were part of Defendants' determination. Moreover, the records will help clarify the extent to which the determination to terminate TPS involved a changed legal standard and/or policy considerations and the improper consideration of factors unrelated to extraordinary and temporary conditions in Nepal that prevent Nepali nationals from returning to Nepal in safety.

36.  By letter dated October 3, 2018, USCIS acknowledged receipt of the USCIS Requests. By e-mail dated November 19, 2019, ICE acknowledged receipt of the ICE Requests. By e-mail dated September 24, 2019, DOS acknowledged receipt of the DOS Requests.

37.  Following these confirmations, Plaintiffs received no documents in response to these FOIA requests. After approximately two months of non-receipt of documents, Plaintiffs

filed administrative appeals with each of the agencies on December 21, 2018. Plaintiffs' appeals have resulted in no action by these agencies.

38.        To date, Plaintiffs have not received any documents from Defendants, nor a proposed timeline for production of any documents.

39.        More than 20 working days have passed since Defendants received the Requests.

## CAUSE OF ACTION
## COUNT I
### FOIA Violation: Failure to Disclose and Release Responsive Records
### (Against All Defendants)

40.        Plaintiffs re-allege and incorporate by reference the preceding paragraphs.

41.        Plaintiffs have exhausted all administrative remedies with respect to the USCIS Requests, DOS Requests and ICE Requests under 5 U.S.C. § 552(a)(6)(C)(i).

42.        Plaintiffs have a statutory right under FOIA, 5 U.S.C. § 552(a)(3)(A), to the records they requested, and there is no legal basis for Defendants' failure to disclose them.

43.        Upon receiving Plaintiffs' Requests, Defendants were obligated under 5 U.S.C. § 552(a) to promptly conduct a reasonable search for records responsive to the Requests and to produce any responsive records.

44.        As of the date of this Complaint and in violation of the deadlines set forth in 5 U.S.C. § 552(a)(6), Defendants have failed to disclose and release records in violation of 5 U.S.C. § 552(a).

45.        Defendants have not identified any legal basis for their failure to timely conduct a reasonable search for, and to produce, responsive records.

46.        The failure by Defendants to conduct reasonable searches for records responsive to the Requests and to produce responsive records violates 5 U.S.C. § 552(a) and the regulations promulgated thereunder.

## PRAYER FOR RELIEF

 WHEREFORE, Plaintiffs request that this Court:

(1) Declare that Defendants' withholding of the requested records is unlawful;

(2) Order Defendants to immediately conduct a full, adequate, and expedited search and make available all records responsive to the Requests;

(3) Enjoin the Defendants from withholding all records responsive to the Requests;

(4) Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 5 U.S.C. §

552(a)(4)(E); and

(5) Grant such other and further relief as this Court may deem just and proper.


Dated: June 24, 2019                              Respectfully submitted,

                                                  /s/Matthew K. Handley_____
                                                  Matthew K. Handley
                                                  HANDLEY FARAH & ANDERSON PLLC
                                                  777 6th Street NW
                                                  Eleventh Floor
                                                  Washington, DC 20001
                                                  Phone: (202) 559-2411
                                                  Email: mhandley@hfajustice.com

                                                  /s/George F. Farah_____
                                                  George F. Farah
                                                  HANDLEY FARAH & ANDERSON PLLC
                                                  81 Prospect St
                                                  Brooklyn, NY 11201
                                                  Phone: (703) 851-2467
                                                  Email: gfarah@hfajustice.com

                                                  *Counsel for Plaintiffs*